State *v.* Marcello E.

## STATE OF CONNECTICUT *v.* MARCELLO E.*
### (SC 20792)

McDonald, D'Auria, Mullins, Ecker and Dannehy, Js.**

*Syllabus*

The defendant appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed his conviction of assault in the first degree in connection with the stabbing of the victim. The defendant claimed that the Appellate Court incorrectly concluded that the trial court had not abused its discretion when it admitted evidence of two instances of prior misconduct, during which the defendant physically assaulted the victim by punching her in the face, for the purpose of establishing his specific intent to cause serious bodily injury in connection with the charged offense. *Held*:

Contrary to the Appellate Court's determination, the trial court abused its discretion in admitting the prior misconduct evidence, and, because the admission of that evidence was harmful, this court reversed the Appellate Court's judgment, and the case was remanded for a new trial.

Even if this court assumed that the prior misconduct evidence was relevant to prove that the defendant had the specific intent to cause serious bodily injury, the probative value of the evidence did not outweigh its prejudicial effect.

The key issue at trial was the identity of the person who had stabbed the victim and not whether the assailant had the requisite intent, the probative value of the prior misconduct evidence with respect to the issue of intent was diminished insofar as intent had already been proven by extensive documentary and testimonial evidence demonstrating the nature of the crime, and the admission of the prior misconduct evidence was unduly prejudicial because it presupposed the defendant's identity as the victim's assailant or his propensity to commit the charged offense.

---

* In accordance with our policy of protecting the privacy interests of the victims in cases involving family violence, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

State *v.* Marcello E.

The admission of the prior misconduct evidence was harmful because, although it bore some initial probative value, the prior misconduct evidence resurfaced multiple times during the trial, it presupposed that the defendant was the assailant, the remaining evidence was sufficiently equivocal as to the assailant's identity, and the trial court's limiting instructions could not undo the harm caused by the admission of the challenged evidence when the state's case was predicated on the issue of identity.

(*Two justices dissenting in one opinion*)

Argued September 16, 2024—officially released March 4, 2025

*Procedural History*

Substitute information charging the defendant with the crime of assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gold, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Alvord* and *Suarez, Js.*, with *Bishop, J.*, dissenting, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial*.

*John R. Weikart*, with whom was *Emily Graner Sexton*, for the appellant (defendant).

*Meryl R. Gersz*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Anthony Bochicchio*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this certified appeal, we consider whether the Appellate Court properly upheld the trial court's admission of prior misconduct evidence, an issue we have had to address with increasing frequency. See, e.g., *State* v. *Delacruz-Gomez*, 350 Conn. 19, 20–21, 323 A.3d 308 (2024); *State* v. *Samuel U.*, 348 Conn. 304, 307–308, 303 A.3d 1175 (2023); *State* v. *Patrick M.*, 344 Conn. 565, 594–602, 280 A.3d 461 (2022); *State* v. *Patterson*, 344 Conn. 281, 283, 278 A.3d 1044 (2022); *State* v. *Juan J.*, 344 Conn. 1, 4–5, 276 A.3d 935 (2022).

State *v.* Marcello E.

A jury found the defendant, Marcello E., guilty of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). See *State* v. *Marcello E.*, 216 Conn. App. 1, 3, 283 A.3d 1007 (2022). The Appellate Court upheld his conviction, rejecting the defendant's claim that the trial court had abused its discretion, causing him harm, by admitting evidence of two incidents of prior misconduct, during which he physically assaulted the victim, to demonstrate his specific intent to cause her serious bodily injury, an element of the charged offense. See id., 11–12, 38. On appeal, the defendant asks us to reject the Appellate Court's conclusion that the prior misconduct evidence was admissible and instead to conclude that it was not relevant to a material fact in the case, and, even if it were relevant, that its probative value did not outweigh its prejudicial effect. We agree with the defendant to the extent that the evidence was unduly prejudicial and harmful and therefore reverse the judgment of the Appellate Court and order a remand of the case for a new trial.

The Appellate Court's decision describes much of the procedural history and relevant facts, which we summarize and supplement with additional facts that the jury could have reasonably found. See id., 3–6. The defendant and the victim were in a romantic, cohabitating relationship until November, 2009, two years before the date of the charged crime, and had two children together, a daughter, S, and a son, J. Toward the end of their relationship, there were multiple incidents of domestic violence in which the defendant physically assaulted or verbally threatened the victim. The prior incidents each occurred at least two years before the criminal conduct at issue.

On November 16, 2011, at approximately 5:56 p.m., the victim was stabbed across her head, legs, arm, and back while entering her home through the rear entrance. It was raining heavily at the time, and the victim had

State *v.* Marcello E.

just returned from a grocery store with S, then eight years old, who entered the home before the stabbing began. The attacker tried to drag the victim outside but ran away after thirteen year old J, who was home at the time, responded to the victim's cries, helped her inside, and locked the door. The victim then told J that his father had stabbed her. J called 911 but did not identify the defendant as the assailant while on the phone with the police.[1] Immediately afterward, S called the defendant to tell him what had happened to her mother, but the call dropped shortly after it began.

When the police arrived, the victim was lying on the ground in a large pool of blood near the back stairwell

---

[1] Both the victim and J testified at trial, nearly eight years after the incident, that the victim had told J on the night of the incident that his father had attacked her. It is therefore appropriate to observe, reading the evidentiary record in the light most favorable to sustaining the verdict, that the jury could have reasonably believed that the victim in fact had identified the defendant on the night of the incident. However, the evidence adduced at trial was not entirely clear regarding whether the victim in fact identified the defendant as her attacker that night. For example, as noted, J called 911 that night but did not identify the defendant as the assailant while on the phone with the police. Also, after purporting to tell J immediately after the attack that the defendant had stabbed her, and after being taken to a hospital following the attack, the victim told a police officer that she did not recognize or see the person who had stabbed her. Although one of the responding police officers testified that his conversations with the victim, S, and J while at the crime scene made the defendant a potential suspect, there was no evidence offered at trial that a written record existed to this effect, so it was not made clear whether the police had deduced that the defendant might have been a suspect or whether someone in the victim's household identified him that night. In fact, no recorded evidence of the defendant's involvement in the attack surfaced until the victim identified him as her assailant when the police showed her a photographic array that featured the defendant—the victim's former boyfriend and the father of her children—among photographs of strangers. J ultimately corroborated the victim's identification of the defendant in a written statement to the police three weeks after the attack but only after the victim identified the defendant in the photographic array. Finally, J was hesitant at trial to unequivocally testify that his father was the assailant, requiring the prosecutor to refresh his memory with the written statement that J had given to the police three weeks after the stabbing.

State *v.* Marcello E.

area of the home. The police verified that there were no eyewitnesses to the stabbing. They could not find evidence of fibers, hairs, or "anything anyone might have dropped behind" at the crime scene, although this was perhaps explained by the rainy weather. The victim was taken to a hospital for immediate medical treatment, including a large amount of pain medication.

Earlier that day, the defendant had picked up S from school pursuant to a standing agreement he had with the victim, namely, that the defendant or his mother, O, would pick up S from school after 3 p.m. and watch her until the victim finished her workday after 5 p.m. On the day of the attack, at approximately 3:45 p.m., the defendant picked up S, took her to a fast-food restaurant, and then went back to O's home, where he was living at the time. S saw the defendant, the only person with her at O's house, leave with a backpack and get into a car she did not recognize at approximately 5 p.m., thirty minutes before the victim came to pick her up and fifty-five minutes before the stabbing.[2]

_____

[2] We observe, as we did with respect to whether the victim had identified the defendant on the night of the attack; see footnote 1 of this opinion; that, reading the evidentiary record in the light most favorable to sustaining the verdict, the jury reasonably could have credited S's account of the events at issue. However, the particulars of what happened between S's arrival at O's home and the stabbing—and therefore, S's account—were disputed at trial. That dispute was highly relevant to the verdict, considering that the alternative timeline presented by the defendant, O, and his sister, D, supported the defendant's innocence. As noted, S testified that only she and the defendant were at O's house that afternoon and that she saw him leave the house with a backpack. O, on the other hand, testified that she was home the entire time with S, the defendant, and her infant grandson, who was unrelated to the victim, S, or J. O indicated that, after S and the defendant arrived at her house, the defendant went upstairs to sleep. She also testified that the defendant had back problems because of a workplace injury and that she had never seen him wear a backpack. Further, O testified that it would have been impossible for the defendant to leave the house without her knowing because she was walking around the ground floor of the house with her grandson at the time, and the door the defendant would have exited from would have made a loud noise. D corroborated O's account, testifying that she had arrived at O's home shortly after the victim picked up S and saw the defendant coming down the stairs with O to talk to the police, with

State *v.* Marcello E.

After the victim was taken to the hospital, the police went to O's home to ask the defendant where he was at the time of the stabbing. The responding officer observed that the defendant came downstairs and stated that he was at O's house all day. The officer also spoke with O and the defendant's sister, D, both of whom were home at the time, but he did not ask for their statements or create notes summarizing their conversations. He did not observe any blood, water, or debris on the defendant or in the home.

The police continued their investigation over the next several days, culminating in their showing the victim a photographic array that included five strangers along with the defendant. Five days after the stabbing, the victim, still in the hospital, was presented with that array and identified the defendant as the person who had stabbed her. The police then obtained an arrest warrant for the defendant and took him into custody. Shortly thereafter, on December 7, 2011, J provided a sworn statement to the police in which he averred that the victim had told him on the night of the stabbing that his father had attacked her.

Prior to the start of trial, the defendant filed motions for the state to disclose, and, ultimately, for the court to preclude, any evidence of prior misconduct that the state would seek to present at trial. Once the state indicated that it would seek to offer evidence of four incidents of the defendant's prior misconduct as relevant to the defendant's motive and intent, the court held a hearing to determine their admissibility. Defense counsel objected to the admission of these incidents as irrelevant and highly prejudicial, particularly considering that the main issue for the jury to determine was

his hair mussed, as if he had just woken up. The defendant also testified in his defense, maintaining his alibi that he was sleeping in O's home at the time of the stabbing.

351 Conn. 345 MARCH, 2025 351

State *v.* Marcello E.

the identity of the individual who had assaulted the victim rather than the perpetrator's intent or motive.[3] The court concluded that two of the four incidents were relevant to the defendant's intent to cause the victim serious bodily injury and that their probative value outweighed any prejudicial effect because the incidents were neither too remote in time, nor similar in fact, nor severe in injury to arouse the jurors' emotions. The first incident of prior misconduct that the trial court admitted took place in March, 2008. The defendant had punched the victim in the face in their shared home because he was irritated about noise from the victim's vacuuming. She tried to leave the house, but the defendant would not let her. The other incident the court admitted occurred in October, 2009, when the defendant punched the victim in the mouth in front of S, again in their shared home, after an argument about the victim's car overheating. The court determined that the jury could consider these two incidents as relevant to the defendant's intent, but not his motive, and directed the prosecutor to elicit testimony about the prior misconduct in a noninflammatory manner.

On the morning of the first day of trial, prior to the introduction of any evidence that would link the defendant's identity with that of the victim's attacker, the victim testified about the two incidents of prior misconduct that the trial court had ruled admissible. Specifically, the victim testified that the defendant had assaulted her in the past on two occasions while they were arguing. The trial court then instructed the jury that it could not consider the evidence for propensity purposes, noting that, "if you do not believe the evidence of these prior incidents or, even if you do, if you do not find that it logically, rationally, and conclusively

---

[3] For a more detailed description of each of the four incidents and the parties' arguments for and against their admissibility, see *State* v. *Marcello E.*, supra, 216 Conn. App. 6–8.

State *v.* Marcello E.

bears on the issue of the defendant's intent at the time of the crime charged in this case, then you may not consider this testimony relating to the incidents in the past for any purpose whatsoever . . . . You may not allow your mind uncritically to believe that the defendant must be or is more likely to be the person who committed the crime charged in this case merely because of the misconduct he may have directed toward [the victim] previously; nor may you believe that the defendant is or is more likely to be guilty of the offense here charged merely because of the alleged prior misconduct.'' After the court delivered this instruction, the victim testified that the defendant was the person who had stabbed her. She then authenticated several photographs showing the extent of her injuries, which were admitted into evidence. She also testified that she had sustained a collapsed lung and undergone three surgeries as a result of the stabbing. She explained the impact that her injuries had on her daily life, namely, that she was unable to walk for long periods of time, walk up hills or steps, or run.

The incidents of prior misconduct resurfaced during the defendant's testimony and closing arguments to the jury. In its final charge, the trial court instructed the jury that it was ''permitted to consider [the] evidence of prior incidents . . . only if you believe they occurred and, even then, only to the extent that you find that their occurrence may bear on the issue of whether the defendant possessed the requisite intent to commit the crime alleged in this case.''

After the jury found the defendant guilty, defense counsel renewed his prior motions for a new trial and a judgment of acquittal. Counsel argued that the evidence of the defendant's prior misconduct was unduly prejudicial, requiring a new trial. He further argued that the state had not sufficiently proven that the defendant was the person who stabbed the victim, requiring an

State *v.* Marcello E.

acquittal, considering that, as the prosecutor noted during his closing argument, "the issue in this case is identification." The trial court denied these motions, and the defendant appealed to the Appellate Court.

On appeal, the defendant claimed that the trial court had abused its discretion, causing him harm, when it admitted the two incidents of his prior misconduct to demonstrate his specific intent because intent was not in dispute based on the evidence presented at trial. *State* v. *Marcello E.*, 216 Conn. App. 20. He further claimed that, even if the prior misconduct evidence was relevant, it was unduly prejudicial considering that the key issue at trial was the identity of the person who had stabbed the victim, and, yet, the very relevance of the prior misconduct unfairly presumed his involvement in the charged crime. Id., 20, 23–24. A majority of the Appellate Court upheld the trial court's admission of the two incidents of prior uncharged misconduct, first rejecting the defendant's contention that specific intent, an essential element of the charged offense, was not at issue because "[t]he defendant did not directly and explicitly admit before the trier of fact that he had the intent to cause serious physical injury. Therefore, the state bore the burden of proving that the defendant had the intent to cause serious physical injury to the victim." Id., 23. The court next reasoned that, because the two prior incidents involved the same victim and were of a similar nature, they were "especially illuminative of the defendant's motivation and attitude toward that victim and thus of his intent . . . ."(Internal quotation marks omitted.) Id., 24.

The Appellate Court majority further concluded that the incidents of prior misconduct were not unduly prejudicial because they (1) were less severe than the charged crime and would therefore not unduly arouse the jurors' emotions, (2) did not unfairly surprise the defendant because the admissibility of the evidence

State *v.* Marcello E.

was litigated outside the presence of the jury, (3) did not consume an undue amount of time at trial or create side issues, and (4) were presented to the jury in a limited and noninflammatory manner. See id., 31–32. Finally, the majority held that the prior misconduct evidence was harmless in any event, considering the strength of the state's case and the limiting instructions the trial court provided upon the admission of the evidence. See id., 33, 36–38.

Judge Bishop dissented, concluding that the prior misconduct evidence was irrelevant, unduly prejudicial, and harmful to the defendant. See id., 46, 53–55 (*Bishop, J.*, dissenting). Judge Bishop stressed that, in his view, the testimony constituted inadmissible propensity evidence because intent was "evident from the nature of the attack itself and was not contested at trial." Id., 46. He relied on this court's recent decision in *Juan J.*, which held that, "in a general intent crime case, in which the theory of defense is that the conduct did not occur at all, rather than a theory of defense in which the conduct occurred unintentionally, uncharged misconduct is irrelevant and inadmissible to prove intent." *State* v. *Juan J.*, supra, 344 Conn. 4–5. He also distinguished the appellate cases that the state and the majority relied on, noting that the incidents did not "bear sufficient commonalities to be probative of the defendant's intent to commit the crime in question . . . ." *State* v. *Marcello E.*, supra, 216 Conn. App. 52 (*Bishop, J.*, dissenting). Finally, Judge Bishop concluded that admission of the prior misconduct evidence harmed the defendant because, contrary to the majority's assertion, the other evidence at trial was in equipoise as to the determinative issue of the assailant's identity. Id., 56.

We granted the defendant's petition for certification to appeal, limited to the issues of whether the Appellate Court correctly concluded that (1) the trial court had not abused its discretion by admitting evidence of prior

State *v.* Marcello E.

misconduct to establish intent, and (2) any error in the trial court's admission of evidence of prior misconduct was harmless. See *State* v. *Marcello E.*, 346 Conn. 901, 901–902, 287 A.3d 136 (2023). We agree with the defendant that the evidence of prior misconduct was unduly prejudicial and that its admission was harmful.

As a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime for which he is on trial. "Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . This evidence may be admissible, however . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 344 Conn. 290–91. We have previously admonished trial courts to carefully weigh whether to admit evidence of prior misconduct because, "while typically being of relatively slight value, [it] usually is laden with the dangerous baggage of prejudice, distraction, and time-consumption." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 395, 796 A.2d 1191 (2002); see also *Michelson* v. *United States*, 335 U.S. 469, 475–76, 69 S. Ct. 213, 93 L. Ed. 168 (1948) ("The state may not show [the] defendant's . . . specific criminal acts . . . even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." (Footnotes omitted.)).

Therefore, "[w]e have developed a two part test to determine the admissibility of such evidence. First, the

State *v.* Marcello E.

evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (c) of the Connecticut Code of Evidence]. . . . Second, the probative value of the evidence must outweigh its prejudicial effect." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 344 Conn. 291. We have stated that the trial court has wide discretion over this evidentiary question and that we will overturn the court's ruling only upon a showing of a clear abuse of that discretion. See, e.g., *State* v. *Mark T.*, 339 Conn. 225, 232, 260 A.3d 402 (2021).

"Relevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . This concept embodies two components: (1) probative value, and (2) materiality." (Internal quotation marks omitted.) Id., 241. For purposes of resolving the present case, we will assume, without deciding, that the defendant's prior misconduct was both probative and material, and therefore relevant, to whether he had the specific intent to commit the assault because intent was an element of the charged offense and therefore is "always at issue unless directly and explicitly admitted before the trier of fact." *State* v. *Baldwin*, 224 Conn. 347, 356, 618 A.2d 513 (1993).[4]

Of course, our assumption that the evidence of prior misconduct was relevant to demonstrate the defendant's specific intent does not end our inquiry. Because

[4] Although it does not change our conclusion, we note our disagreement with the state and the Appellate Court that we can consider the probative value of the defendant's prior misconduct to include his motivation and attitude toward the victim, and therefore his intent to cause her serious bodily injury. The trial court specifically ruled that the jury could not use the prior misconduct evidence to demonstrate the defendant's motive. Therefore, the similarities between the prior misconduct and the charged offense cannot logically be probative of the defendant's motivation and attitude toward the victim.

State *v.* Marcello E.

the general rule is that evidence of "other crimes, wrongs or acts" of a person is inadmissible; Conn. Code Evid. § 4-5 (a); we have held that, for evidence to fall within the "exceptions to [that] general prohibition" and be admissible for the purposes specifically contained in § 4-5 (c), "the probative value of the evidence must outweigh its prejudicial effect." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 344 Conn. 290–91. "[T]his court has identified four situations in which the potential prejudicial effect of relevant evidence would suggest its exclusion . . . (1) [when] the facts offered may *unduly* arouse the [jurors'] emotions, hostility or sympathy, (2) [when] the proof and answering evidence it provokes may create a side issue that will *unduly* distract the jury from the main issues, (3) [when] the evidence offered and the counterproof will consume an *undue* amount of time, and (4) [when] the defendant, having no reasonable ground to anticipate the evidence, is *unfairly* surprised and unprepared to meet it." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Delacruz-Gomez*, supra, 350 Conn. 24. "This balancing inquiry is necessary to militate against the risk that the attention of a jury may be distracted from consideration of the proof of the charges at hand, and, instead, and for improper reasons, fix the defendant's guilt on evidence of marginal evidentiary value." (Internal quotation marks omitted.) Id. This inquiry is particularly important with respect to prior misconduct evidence, given its "typically . . . slight value [and potential for] . . . prejudice, distraction, and time-consumption." (Internal quotation marks omitted.) *State* v. *Meehan*, supra, 260 Conn. 395. When the probative value of the prior misconduct evidence "is marginal and its prejudicial tendencies [are] clear . . . the discretion invested in the trial court is not a license to depart from the principle that evidence of other crimes, having no substantial

State *v.* Marcello E.

relevancy except to ground the inference that the accused is a bad person and hence probably committed this crime, must be excluded.'' *State* v. *Onofrio*, 179 Conn. 23, 30, 425 A.2d 560 (1979).

The defendant argues that the trial court improperly concluded that the probative value of the prior misconduct evidence outweighed its prejudicial effect because ''the other evidence presented by the state (the highly violent and injurious nature of the attack itself) definitively established the requisite specific intent, [meaning that] the uncharged misconduct evidence could have no practical effect on the [jurors] other than to convince them that the defendant had violent tendencies and a propensity toward violence against [the victim] in particular.'' The state responds that the trial court properly balanced the potential prejudice of the prior misconduct evidence by concluding that ''the prior misconduct was much less severe than the charged offense,'' by permitting only ''a redacted version of the prior incidents,'' and by issuing limiting instructions, all of which made it unlikely that the prior misconduct evidence would ''unduly arouse the [jurors'] emotions, hostility, or sympathy . . . [or] consume an undue amount of time or create any side issues.'' (Citation omitted.)

We agree with the defendant that the slight probative value of the prior misconduct evidence did not outweigh its prejudicial effect. The prior misconduct evidence was admitted as relevant solely to prove the assailant's specific intent to commit the charged offense, not his motive or identity. Because the trial court was on notice, before it ruled on the admissibility of the prior misconduct evidence, that (1) there would be ample other evidence demonstrating the assailant's specific intent, (2) the assailant's identity, not his intent, was truly what would be at issue, and (3) the victim would testify early in the trial about the prior misconduct and then identify

351 Conn. 345 MARCH, 2025 359

State *v.* Marcello E.

the defendant as her assailant, we conclude that the trial court abused its discretion by prematurely admitting the prior misconduct evidence, considering that its value was "marginal and its prejudicial tendencies clear." *State* v. *Onofrio*, supra, 179 Conn. 30.

Prior to the start of evidence, the prosecutor summarized for the court the nature of the charged conduct, highlighting that the victim intended to testify that she had been stabbed multiple times, causing "significant injury to her legs and to her head." The prosecutor anticipated that the victim would then "testify that [the defendant] is the individual who stabbed me." The court also was put on notice at that time that the anticipated main issue at trial would not be the assailant's specific intent but, rather, "who assaulted her." The court should have recognized that admitting the prior misconduct evidence was unduly prejudicial, at least at the time it was admitted, because it would presuppose the determinative issue at trial—the assailant's identity—while only advancing a slight probative value and doing so in a cumulative fashion. Its failure to do so, particularly considering the state of the pretrial record and that the prior misconduct evidence, at the very least, came up to the "fine line" of impermissible propensity evidence, constituted an abuse of discretion.[5] *State* v. *Beavers*, 290 Conn. 386, 405 n.19, 963 A.2d 956 (2009).

[5] We are cognizant that the trial court was asked to rule on the admissibility of the prior misconduct evidence before the state began presenting evidence, and therefore before it knew with certainty whether that evidence would be merely cumulative or that the assailant's identity would truly be the determinative issue at trial. However, as discussed, prior to the presentation of evidence, the trial court had enough information about the nature of the misconduct evidence and the trial such that deferring the admission of or a final ruling on the prior misconduct evidence would have been the prudent course to take.

More generally, however, whether a trial court can know, prior to trial, that prior misconduct evidence will be unduly prejudicial is a highly fact specific inquiry that is dependent on whether the state provides an offer of proof outlining the evidence it plans to present at trial and whether the court is aware of the defendant's defense. Because evidence of prior misconduct

State *v.* Marcello E.

Once the presentation of evidence began, the prejudicial impact of the prior misconduct only increased as its merely cumulative nature materialized and its probative value continued to wane, supporting our conclusion that the trial court had abused its discretion when it admitted that evidence. See *State* v. *Mark T.*, supra, 339 Conn. 246 ("[R]elevant cumulative evidence is properly excluded when, in the court's exercise of discretion, it is unfairly cumulative and, thus, is more prejudicial than probative . . . . [T]he exclusion of cumulative evidence targets prejudicial overemphasis and inefficient judicial proceedings." (Citation omitted; internal quotation marks omitted.)). The prosecution's pretrial summary to the court about how the trial would unfold proved accurate: before and after the state introduced the prior misconduct evidence, the jury heard extensive evidence of the nature of the attack on the victim, ensur-

carries such potential for prejudice, and, often, as in the present case, is of such slight probative value, we encourage trial courts to withhold a final decision on whether to admit evidence of prior misconduct until a point in the trial when it is apparent to the court that the evidence is both relevant and not unduly prejudicial.

We have previously detailed the procedures that other courts have taken to this effect, noting that withholding a decision "encourages flexibility in a trial court's exercise of discretion, allowing [courts] to rule on the admission of uncharged misconduct using pretrial procedures if there is a record basis to reliably determine the relevance and admissibility of other acts evidence . . . but . . . if the [trial] court still remains uncertain of an appropriate ruling at the conclusion of the prosecutor's other proofs, it should permit the use of other acts evidence on rebuttal, or allow the prosecution to reopen its proofs after the defense rests, if it is persuaded in light of all the evidence presented at trial, that the other acts evidence is necessary to allow the jury to properly understand the issues . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Juan J.*, supra, 344 Conn. 24–25 n.12. In the present case, for example, had the trial court waited to issue a decision on the evidence of prior misconduct, it would have appropriately opted to disallow that evidence because it was cumulative, given the plethora of other evidence about the nature of the crime. Or the court would have disallowed the evidence because, upon evaluating the state's case, it would have become clear that, because identity was disputed, evidence that presupposed the identity of the assailant was unduly prejudicial.

State *v.* Marcello E.

ing that the assailant's intent to cause serious bodily injury was more than sufficiently demonstrated. Before the victim testified about the defendant's prior misconduct, the jury heard from a responding police officer, Sergeant Chris Hunyadi, who testified that the victim "was lying in a pool of blood and . . . had suffered stab wounds." Later, the jury heard the victim testify that the defendant "ran in front of me and started stabbing me." She then testified about the extent of her injuries, including a collapsed lung and multiple surgeries, and their continued impact on her daily life. The jury also saw photographic evidence of the victim's injuries.

The cumulative nature of the prior misconduct evidence exacerbated its prejudicial impact because it increased the risk that jurors would presuppose the defendant's identity as the assailant, a determinative and disputed fact at trial. The prosecutor recognized that the assailant's specific intent, which the prior misconduct was meant to be probative of, was undisputed, noting in closing argument that "anybody who commits these significant injuries to another party . . . could have no other intent but to cause serious physical injury." The prosecutor continued, recognizing that the real question was the assailant's identity: "[T]he question then becomes, who committed that act? . . . [T]here is only evidence of one particular party; that would be the defendant." Because, as the prosecutor argued, the assailant's intent to cause serious bodily injury was unquestionable, whatever slight probative value the trial court might have attributed to the prior misconduct evidence as to the assailant's intent at the beginning of the trial necessarily decreased once it became clear that intent was not at issue. Meanwhile, the prejudicial impact of the prior misconduct evidence conversely *increased* as the trial continued. Yet, the prior misconduct evidence was presented to and considered by the jury from the first moments of trial until

State *v.* Marcello E.

closing arguments, begging the critical question presented by this case: what, exactly, could the jury have taken from this evidence if intent, the issue for which the prior misconduct evidence was offered, was not in doubt? We are hard-pressed to conclude that it could be anything but the determinative issue of the defendant's identity in the charged offense or, put differently, his propensity to commit the charged offense. Therefore, not only did the probative value of the prior misconduct evidence not outweigh its prejudicial impact at the time the trial court admitted it, but its dangerous prejudicial impact only increased as the trial proceeded. The trial court should have therefore excluded the prior misconduct evidence as unduly prejudicial.

We are particularly concerned about the dangerous prejudicial weight that uncharged misconduct evidence can bring to a trial, considering the powerful potential for this type of evidence to impermissibly demonstrate a defendant's propensity for criminal behavior, as it did in the present case. See *State* v. *Onofrio*, supra, 179 Conn. 29–30; see also *State* v. *Gilligan*, 92 Conn. 526, 536, 103 A. 649 (1918) ("[I]t would be an abuse of discretion to permit proof of similar but unconnected [crimes] . . . where the [s]tate's evidence had already gone so far toward eliminating accident or mistake as to leave no reasonable doubt [of intent] . . . . Otherwise evidence inadmissible on the general issue would be admitted for the special purpose of characterizing an equivocal act . . . and . . . the only practical effect . . . would be to prejudice the accused . . . . In such cases the [s]tate should *exhaust its other evidence of criminal intent* before resorting to proof of other unconnected acts for that purpose, *and* it should not resort to such proof until *it has also exhausted its evidence* connecting the accused with the [crime]." (Emphasis added.)).

State *v.* Marcello E.

The state suggests that our reliance on *Onofrio* and *Gilligan* is misplaced because this court has distinguished both precedents in subsequent decisions. See *State* v. *Patrick M.*, supra, 344 Conn. 601 n.12; *State* v. *Beavers*, supra, 290 Conn. 405 n.20. But the state improperly characterizes our case law. *Onofrio* and *Gilligan*, like *Patrick M.* and *Beavers*, stand for the long held proposition that evidence must be relevant and more probative than prejudicial to be admissible.

In *Onofrio*, this court held that photographic evidence of the defendant's collection of guns, including his holster, was inadmissible to demonstrate that he had the means to commit murder because the murder weapon was a handgun not contained in his collection, the state had not sufficiently connected the presence of the defendant's guns to the crime charged, and "the jury had been fully apprised" of the holster's qualities, considering that it had been admitted as a full exhibit and the state's expert had testified extensively about it. See *State* v. *Onofrio*, supra, 179 Conn. 31. Put differently, the only purpose jurors could have taken this evidence to demonstrate would be propensity—i.e., the defendant owned guns and was therefore more likely to have committed murder with a gun. See id., 31–32. In *Gilligan*, we similarly concluded that evidence of prior misconduct was inadmissible because the state had presented sufficient evidence demonstrating the defendant's specific intent to commit the crime at issue. See *State* v. *Gilligan*, supra, 92 Conn. 536.

In contrast, in *Patrick M.*, we clarified that evidence of the defendant's prior threatening misconduct toward his wife's romantic partner was admissible because it was "not cumulative [as it] . . . presented the jury with new material . . . not heard from any other witness . . . ." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 601 n.12. Finally, in *Beavers*, we concluded that evidence of the

State *v.* Marcello E.

defendant's prior misconduct, including burning down the family trailer for insurance money, telling his former wife that he had set fires for money, and threatening to burn down their home, was relevant to the defendant's specific intent to commit a separate arson when the other evidence of the defendant's intent was not conclusive.[6] See *State* v. *Beavers*, supra, 290 Conn. 394–95.

Our holdings in *Patrick M.* and *Beavers*[7] do not change our conclusion in the present case that the evidence of prior misconduct was inadmissible to demonstrate the defendant's specific intent to cause the victim serious bodily injury because of its unduly prejudicial nature. In fact, those two precedents help draw the important distinction that resolves this case. The evidence in *Patrick M.* and *Beavers* was admissible because it provided new material, not merely cumulative evidence, to demonstrate the respective defendants' motive and intent.

---

[6] In *Beavers*, without the defendant's prior misconduct, the evidence of the defendant's specific intent to commit arson included indeterminate results of the fire marshal's investigation, police interviews with the defendant and other witnesses to the fire, and circumstantial evidence from neighbors. See *State* v. *Beavers*, supra, 290 Conn. 394–95. This evidence, although compelling, was equivocal as to the defendant's intent to commit arson, rendering the prior misconduct evidence not merely cumulative. Id., 398.

We note that, in *Beavers*, the court stated that there was no harmful error because of the overall strength of the state's case. See id., 419–20. We specifically noted that, taken as a whole, the evidence in that case was not equivocal, making it less prone to harmful error. See id., 420. Our conclusion of harmlessness in *Beavers* due to the unequivocal nature of the evidence in its totality does not alter our characterization of the evidence of the defendant's *intent* in the present case as inconclusive.

[7] The Appellate Court and the state look to our remarks in *Beavers* indicating that *Gilligan* was confined to its facts because it "focuses largely on the unduly prejudicial impact of that uncharged misconduct evidence in light of the fact that the state already had introduced ample evidence of absence of mistake" to diminish support for the defendant's position. *State* v. *Beavers*, supra, 290 Conn. 405–406 n.20. In fact, the present case fits precisely into the limited circumstances we discussed in *Beavers*, despite our having framed the analysis in *Gilligan* around a threshold relevance inquiry, considering that the evidence of specific intent is undisputed and proven by the nature of the crime.

State *v.* Marcello E.

In contrast, the evidence in *Onofrio* and *Gilligan* was inadmissible because it functionally demonstrated the respective defendants' propensity to commit the charged crime, considering that its purported purpose was rendered unduly cumulative by the circumstances of the case. To demonstrate the degree to which *Beavers* and *Gilligan* comport, we note that the prior misconduct evidence in *Beavers* was admitted as relevant to intent on the third day of trial, *after* the state sufficiently had "established that the defendant had caused the fire" but while the defendant's intent was still uncertain due to the equivocal evidence on the subject. *State* v. *Beavers*, supra, 290 Conn. 402. The admission of prior misconduct evidence in *Beavers*, therefore, could not presuppose the defendant's identity or his propensity to commit the charged offense, meaning that both *Beavers* and *Gilligan* contemplate that prior misconduct evidence should not be the state's tool of first resort in proving an element of the charged crime, considering the typically slight value and particularly grave danger of such evidence.

Applying our case law to the facts of the present case, we must not lose sight of the forest for the trees. The danger that evidence of prior misconduct will improperly function as propensity evidence is at its zenith in a case such as the present one, in which its probative value was rendered merely cumulative because the issue of intent was already proven by extensive documentary and testimonial evidence demonstrating the nature of the crime. There was, therefore, an unacceptable risk that the jury would interpret the prior misconduct evidence in exactly the manner we have prohibited: the defendant had attacked the victim before, and, therefore, he must have done so this time as well. See, e.g., *Michelson* v. *United States*, supra, 335 U.S. 475–76.

We are not persuaded by the state's arguments to the contrary. The state fails to address the marginal

State *v.* Marcello E.

probative value that the prior misconduct evidence provided in conjunction with its cumulative nature and the logical conclusion that jurors might draw concerning the defendant's identity as the assailant, given that cumulative nature, particularly as the trial went on and the prejudicial impact of the prior misconduct evidence became more apparent. The arguments that the state advances to support its position are all accurate in a technical sense—the court did issue proper limiting instructions to the jury, the prior misconduct evidence was presented in a somewhat sanitized manner, the defendant was not surprised by the evidence, the charged crime was more severe than the prior misconduct, the prior misconduct was minimally discussed when compared to the full length of the trial—and, yet, none of these factors mitigates the fact that the prior misconduct evidence was merely cumulative and, to be relevant to the jury's determination, had to strongly indicate that the defendant was the victim's assailant, impermissibly suggesting his propensity to commit the charged offense based on his prior conduct. For example, although the prior misconduct was discussed minimally in comparison to the entirety of the trial transcript, it still surfaced repeatedly during the trial, including after the state acknowledged that the assailant's intent to cause the victim serious bodily injury was indisputably demonstrated. And, although proper limiting instructions can ameliorate potential prejudice to a defendant, they do not invariably do so. See, e.g., *State* v. *Juan J.*, supra, 344 Conn. 33.[8]

_____

[8] Both parties argue that their respective positions in the present case are consistent with our recent decision in *Juan J.*, in which we stated that, when a charged crime involves general intent, "the state's introduction of uncharged misconduct is properly limited to cases in which the evidence is needed to 'prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove.' " *State* v. *Juan J.*, supra, 344 Conn. 20. The state argues that the present case is distinguishable because the charged crime required proof of the defendant's specific intent, an element of assault in the first degree, whereas the charged crime in *Juan J.* was one of general intent. We disagree

State *v.* Marcello E.

Having concluded that the evidence of the defendant's prior misconduct was unduly prejudicial, and was therefore erroneously admitted, we must now consider whether the defendant has demonstrated that the trial court's admission of prior misconduct evidence was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony . . . whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [C]redibility contest[s] characterized by equivocal evidence . . . [are] a category of cases that [are] far more prone to harmful error." (Citations omitted; internal quotation marks omitted.) *State* v. *Beavers*, supra, 290 Conn. 419–20. When a case "involves the improper admission of uncharged misconduct evidence, the most relevant factors to be considered are

with the state's constrained characterization of *Juan J.* and clarify how it comports with our decision today. *Juan J.* concerned evidence that was irrelevant to intent because intent was neither a disputed issue nor an element at trial. The present case concerns evidence that was unduly prejudicial because, although it was arguably, albeit minimally, probative of a statutorily required element, that element was undisputed and supported by ample, concrete facts that, unlike the facts pertaining to the prior misconduct evidence, did not come close to amounting to propensity evidence.

State *v.* Marcello E.

the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact.'' (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 364, 933 A.2d 1158 (2007).

The state contends that there was no harm to the defendant as a result of the admission of prior misconduct evidence because of the strength of the state's case and the court's limiting instructions. On the other hand, the defendant claims that the error was harmful because the overall evidence presented at trial was equivocal as to the identity of the victim's assailant and that the manner in which the prior misconduct evidence was presented increased ''[t]he possibility that the jury viewed [it] as showing the defendant's propensity [for] violence against [the victim].'' We are convinced that the defendant has met his burden of demonstrating harm and conclude that the evidence of prior misconduct was harmful for largely the same reason it was unduly prejudicial: although it bore some initial probative value and the trial court issued proper limiting instructions, the court's admission of the prior misconduct evidence improperly presupposed that the defendant was, in fact, the victim's assailant when the evidence presented to that effect was equivocal and a determinative issue at trial. We largely agree with Judge Bishop's assessment of harm, departing only in our determination that the evidence presented at trial as to the defendant's identity was equivocal, rather than in perfect equipoise. See *State* v. *Marcello E.*, supra, 216 Conn. App. 55–62 (*Bishop, J.*, dissenting). Further, even if we did not agree with Judge Bishop, we still would not have ''a fair assurance'' that the jury's verdict was not ''substantially swayed by the error.'' (Internal quotation marks omitted.) *State* v. *Beavers*, supra, 290 Conn. 419. This is to say that, *even if* the jury was more likely to credit the state's witnesses, we remain unconvinced that the error was harmless because, without the prior

State *v.* Marcello E.

misconduct evidence and considering the dangerous "fine line" between the admitted evidence and propensity evidence, the remaining evidence was *sufficiently* equivocal as to the defendant's identity to warrant our conclusion of harmful error. Id., 405 n.19.

The following additional facts are relevant to the disputed nature of the assailant's identity. There was no physical or forensic evidence suggesting that the defendant was the assailant. The trial was, rather, a classic credibility contest: the jury had to decide whether it believed the defendant's or the victim's version of events, both of which were supported by corroborating testimonial and circumstantial evidence. The defendant's alibi—that he was asleep in O's house while the stabbing happened—was supported by the testimony of O and D. On the other hand, the victim's story— that the defendant stabbed her and ran away—was bolstered by the testimony of J and S.

The testimony of each witness was fallible in one way or another, bolstering the overall equivocal nature of the evidentiary record. For example, put mildly, J was a difficult witness, which could have compromised his credibility in the eyes of the jurors. S was eight years old at the time of the stabbing, which could have explained the inconsistencies in her testimony as an adult: although she initially stated that O was not at her house on the day of the stabbing, she later testified that she did not remember. Further, although the victim stated that the defendant had attempted to pull her outside until then thirteen year old J picked her up and carried her inside, J did not testify that he saw the victim being pulled outside, only that he saw a figure in all black clothing running away. As for O and D, the defendant's mother and sister, respectively, it was unclear whether the reason that the police did not take statements from them was because they were uncooperative or because the police never asked. Both O and

State *v.* Marcello E.

D testified that they would have cooperated with the police had they followed up to ask for statements, although Officer Valentine Olabisi testified that the two women were uncooperative when he spoke with them at O's home on the evening of the stabbing. The state's case may have been strong in some respects, but not to the degree that would lead a reasonable jury to characterize the trial testimony as unequivocal. Rather, a decade out from the events of the stabbing, the witnesses' recollections, on both sides, lacked precision, and their demeanor made their credibility questionable.

The circumstantial evidence presented at trial was similarly equivocal as to the assailant's identity. On the night of the stabbing, the victim had stated to Hunyadi that she did not know who attacked her. The earliest record demonstrating the victim's identification of the defendant as her assailant occurred five days following the attack, after the police showed her the photographic array, which included the defendant's photograph.[9] Three weeks later, J provided a sworn, written statement to the police in which he stated that the victim had told him on the night of the stabbing that his father had attacked her. Despite J's statement that the victim identified the defendant as her assailant on the night of the stabbing, he did not relay that identification on the 911 call according to Detective Luis Poma, who listened to the call as part of his investigation. During his testimony, Poma agreed with defense counsel that

_____

[9] The record does not explain what led the police to present the victim with a photographic array that included someone whom she obviously knew: her former boyfriend and the father of her two children. Although the defense did not challenge the admissibility of the victim's identification of the defendant by this procedure, either at trial or on appeal, the suggestiveness of the photographic array, along with the fact that the only police records of either the victim's or J's identification of the defendant as the assailant came *after* the police had shown the victim this array, detracts from the strength of the state's case and, in particular, the victim's identification of the defendant as her assailant.

State *v.* Marcello E.

he had spoken with J on the night of the attack and learned "much of the information" J formally provided in his written statement three weeks later that same night. Poma then immediately agreed with defense counsel that "[J's] mother had identif[ied] the defendant [to J] as the party responsible." Whether Poma learned of J's positive identification of the defendant when J provided his written statement, rather than when the attack occurred weeks earlier, was a fact that the jury could, at best, infer, but that inference was by no means obvious or compelled. During closing argument, defense counsel argued that, had the defendant been identified that evening, as some of the testimony suggested, the police would have done more than merely go to O's house and ask where the defendant was at the time of the attack. Defense counsel further argued that, by virtue of the rainy weather and the short time period the defendant would have had to attack the victim and return to O's house, he could not have been the assailant, considering that the police saw no trace of blood, water, or debris on him or in O's home. The prosecutor, in turn, suggested that the defendant had hung up the phone after S told him about the stabbing, perhaps implying a guilty mindset, and that the defendant's alibi lacked credibility. In sum, considering that the evidence presented at trial as to the assailant's identity was highly contested, we reject the state's argument that the strength of its case mitigated any harm to the defendant.

Regardless, our inquiry as to harm would continue even if we were persuaded that the evidence demonstrating that the defendant was the victim's assailant was stronger than the evidence that he was not, considering the " 'dangerous baggage of prejudice' " that accompanies prior misconduct evidence. *State* v. *Meehan*, supra, 260 Conn. 395. In turn, we note that our conclusion that the evidence of prior misconduct was harmful because

State *v.* Marcello E.

it presupposed that the defendant was the person who attacked the victim at her home, under the guise of demonstrating his intent to cause serious bodily injury, is additionally supported by *when* that evidence was presented to the jury. As we indicated, the evidence of prior misconduct was introduced on the morning of the first day of trial, prior to the introduction of any evidence that would link the defendant's identity with that of the victim's attacker on November 16, 2011. Only after the victim testified that the defendant had punched her on two occasions during separate arguments that became physical and the court gave its limiting instruction did she testify that the defendant was the person who had stabbed her.

The incidents of prior misconduct resurfaced multiple times during the trial, increasing the likelihood that the jury might afford them improper weight as to the assailant's identity. When the defendant took the stand as the final witness at trial, the prosecutor repeatedly asked whether he "had physical altercations with [the victim] during [their] relationship . . . ." The defendant explained on redirect examination that, although it was true that he had physical altercations with the victim in the past, he had accepted responsibility for that behavior. During closing argument, shortly after acknowledging that "the issue in this case is identification," the prosecutor referred to the defendant's prior physical conduct, stating: "That can be considered by you." Defense counsel also mentioned the prior misconduct during closing argument, stating that the defendant "had a physical altercation . . . three years before the incident. But certainly nothing even close to the level of violence we see in this case and certainly with no weapon of any type." It is worth repeating that the trial court, when it admitted the evidence of prior misconduct, had been made aware that identity, not intent, was at issue.

State *v.* Marcello E.

Because the identity of the attacker was key to the jury's determination, and therefore the trial's outcome, we are unable to conclude that the jury could have heard the evidence of the defendant's prior misconduct to establish the assailant's intent without concluding that it was, in fact, the defendant who had possessed that intent. The state recognizes this point in its brief, repeatedly stating that the prior misconduct evidence was relevant to ''*his* intent to cause the victim serious physical injury . . . .'' (Emphasis added.) Demonstrating the assailant's identity was the greatest hurdle the state faced in proving its case against the defendant. Because the evidence of prior misconduct presumed that the defendant was the person who stabbed the victim, it tainted the jury's ability to determine that issue.

Finally, we reject the state's argument that the trial court's limiting instruction cured any prejudice to the defendant. Although we presume that jurors abide by curative instructions, that presumption is not limitless, as we mentioned previously. See, e.g., *State* v. *Grenier*, 257 Conn. 797, 810, 778 A.2d 159 (2001). For example, we have stated that ''a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible] evidence,'' particularly when ''the state's case was predicated'' on that impact. (Internal quotation marks omitted.) Id., 811, 812; see also *State* v. *Favoccia*, 306 Conn. 770, 815–16, 51 A.3d 1002 (2012). In the present case, the trial court's limiting instruction on the prior misconduct evidence could not undo the harm that evidence wrought on the defendant's case because the state's case was predicated on the identity of the assailant, which the prior misconduct invariably linked to the defendant. The limiting instruction, while proper on its face, did not undercut the impermissible effect of the prior misconduct evidence. It did not, for example, admonish the jury that it should *not* use the

State *v.* Marcello E.

prior misconduct evidence for motive; nor did it distinguish the difference between evidence admitted to prove motive, identity, or intent, notwithstanding that the court had admitted the prior misconduct solely for intent, but not motive. In short, we are not persuaded that the trial court's limiting instruction or the strength of the state's case cured the prejudicial impact to the defendant. We therefore lack a "fair assurance" that the erroneously admitted prior misconduct evidence, which we have stated holds particular prejudicial potential and should be admitted with great caution, "did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 363.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the trial court's judgment and to remand the case for a new trial.

In this opinion McDONALD and ECKER, Js., concurred.

MULLINS, C. J., with whom DANNEHY, J., joins, dissenting. This tragic case requires us to determine whether the trial court's admission into evidence of two prior incidents of misconduct was improper and so harmful that the defendant's conviction of assault in the first degree for maiming the mother of his children by repeatedly stabbing her should be overturned. The two prior incidents at issue were that, once, in 2008, the defendant, Marcello E., hit the victim, and that, once, in 2009, the defendant punched the victim.[1] For purposes of this

---

[1] Prior to trial, the court made clear that the prosecutor "shall elicit testimony regarding [the] two prior incidents in a noninflammatory manner." The prosecutor was not permitted to question the victim about police involvement or court proceedings that may have followed the incidents or to elicit any testimony that, as the victim testified to in the proffer, there was a lot of blood after the defendant had punched her in the mouth. The prosecutor adhered to the trial court's limitations.

State *v.* Marcello E.

dissent, I will assume that the trial court abused its discretion in allowing the victim to testify about the two prior incidents. I cannot, however, agree with the majority that the defendant has met his burden of demonstrating that this evidentiary error was harmful. Thus, I respectfully dissent.

During the trial, the state's first witness, Chris Hunyadi, an officer with the Hartford Police Department, explained that he was the first law enforcement officer to arrive at the scene of the crime in response to a 911 call indicating that a person had been stabbed. When Hunyadi arrived, he saw the victim lying in a large "pool of blood," and he could tell that she had been stabbed.

Shortly after the stabbing, the victim was transported to a hospital. Hunyadi went to the hospital, and, while the victim was under the influence of "a decent amount of pain medication," he asked her if she had seen her assailant. At that point in time, she said she had not. Testimony established, however, that the victim had in fact identified the defendant as the assailant on the night of the incident.

At trial, the victim testified very briefly regarding the two incidents, shorn of any real detail. See footnote 1 of this opinion. With respect to the 2008 incident, she testified that, at that time, she was in a romantic relationship with the defendant. The victim explained that they had two children, a son, J, and a daughter, S, and that they were all living together. In March, 2008, the victim and the defendant got into an "argument" in which she "asked him to leave, and it became verbal, and then it became physical," and he "hit" her. Then, in October, 2009, the victim's "car had overheated," and, when the defendant arrived to help her get to work, an argument ensued, and he punched her in the face. Immediately after this testimony, the trial court issued a limiting instruction, informing the jury that it could not consider this evidence as proof of the defendant's

State *v.* Marcello E.

bad character or any predisposition on the part of the defendant to commit the assault in this case.[2]

After this brief testimony, which, in the trial transcript, spans approximately two pages of the twenty-

---

[2] The trial court stated in relevant part: "Ladies and gentlemen, I just want to give you an instruction at this point. You recall [that], in the preliminary instructions I gave you a short time ago, I mentioned evidence that may be admitted for a limited purpose. Just now, you've heard [the victim] describe incidents that she stated occurred in 2008, and another incident that occurred in 2009, during the course of a relationship with the defendant, and that, in each of those incidents that she described, there was a physical assault by the defendant against her person.

"This evidence of alleged conduct of the defendant prior to the date of the charged offense, which, as you know, occurred in 2011, is—these prior acts are not being admitted to prove the bad character, propensity or criminal tendencies of the defendant but solely to show or . . . establish what the defendant's intent may have been at the time he's alleged to have committed the specific crime charged here. You may not consider the evidence of these prior acts as establishing a predisposition on the part of the defendant to commit the crime charged or [as] demonstrat[ing] that [the defendant] has a criminal propensity to engage in criminal conduct. You may consider this evidence of these prior incidents only if you believe [they] occurred and, further, only if you find that [their occurrence] logically, rationally and conclusively bears on the issue of whether . . . the defendant had the intent to commit the crime that is charged in this case.

"On the other hand, if you do not believe the evidence of these prior incidents, or even if you do, if you do not find that it logically, rationally, and conclusively bears on the issue of the defendant's intent at the time of the crime charged in this case, then you may not consider this testimony relating to the incidents in the past for any purpose whatsoever. In other words, you may not allow your mind uncritically to believe that the defendant must be or is more likely to be the person who committed the crime charged in this case merely because of the misconduct he may have directed toward [the victim] previously; nor may you believe that the defendant is or is more likely to be guilty of the offense here charged merely because of the alleged prior misconduct.

"Rather, as I have explained, you are permitted to consider this evidence of prior incidents between the defendant and [the victim], as [the victim] has just described [the incidents], only if you believe that they occurred, and then only to the extent that you find their occurrence may bear on the issue of whether the defendant possessed the requisite intent to commit the crime alleged in this case. These alleged prior incidents may not be considered by you for any other purpose." The trial court included another limiting instruction with respect to this evidence in its charge at the end of the trial.

State *v.* Marcello E.

six pages of the victim's testimony, the victim explained the circumstances of the night of the attack. She told the jury that, after picking S up from the defendant's home, where he lived with his mother, O, she stopped at a grocery store. Then, when she arrived home, S went inside the house first. The victim followed, and, when she turned around to close and lock the door, "[the defendant] ran in front of [her] and started stabbing [her]." She testified, "[i]nitially, I thought he was just beating me up. I didn't think I was being stabbed at that time." She confirmed that the defendant had nothing covering his face when he committed this assault. During the assault, the victim yelled for their thirteen year old[3] son, J, to come help her. J came from inside the house, "picked [the victim] up," brought her back inside, "and locked the door." The victim then realized that the defendant had stabbed her. She further testified that, "I felt my leg, and I saw that I was stabbed in my leg. And, at that point, I think the adrenaline wore off, and I started feeling pain all over my body, and I just felt all the blood coming down." And it was then, at the moment immediately after the stabbing, after J brought her back inside the house, that the victim said, "your father stabbed me."

The law governing harmless error for nonconstitutional evidentiary claims is well settled. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the [improperly admitted evidence] in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,

_____

[3] There was conflicting evidence regarding J's age at the time of the assault. See *State* v. *Marcello E.*, 216 Conn. App. 1, 5 n.2, 283 A.3d 1007 (2022).

State *v.* Marcello E.

the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, [this court] must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when [this] court has a fair assurance that the error did not substantially affect the verdict.'' (Internal quotation marks omitted.) *State* v. *Outlaw*, 350 Conn. 251, 283–84, 324 A.3d 107 (2024).

In my view, placing the burden on the defendant, where it properly lies, the defendant has not demonstrated that the trial court's admission of the two prior incidents substantially affected the jury's verdict in this case. The state presented strong evidence of the defendant's guilt. The victim's testimony was compelling, consistent and corroborated circumstantially by other witnesses who had no apparent bias. The defendant's alibi evidence was weak, lacked believability and was supported by witnesses—his mother, O, and his sister, D—who were not disinterested. Nevertheless, the majority concludes that the trial court's admission of the evidence of prior misconduct was harmful because the evidence the state presented to establish that it was the defendant who committed the assault "was equivocal . . . .'' I disagree that the evidence in the present case was equivocal.[4] Instead, I would conclude that the evidence established beyond a reasonable doubt that the defendant had assaulted the victim.

---

[4] In his dissent in the Appellate Court, Judge Bishop characterized the evidence as being "in equipoise . . . .'' *State* v. *Marcello E.*, 216 Conn. App. 1, 56, 283 A.3d 1007 (2022) (*Bishop, J.*, dissenting). The majority of this court disagrees with this characterization and concludes that the evidence "was equivocal . . . .'' In my view, the evidence was neither equivocal nor in equipoise.

State *v.* Marcello E.

The victim's testimony about the attack left no doubt about who her attacker was. Specifically, she testified unequivocally that "[the defendant] ran in front of [her] and started stabbing [her]." The victim's testimony was corroborated by multiple witnesses.

First, J's testimony was consistent with the victim's testimony. J explained that, after he had dragged the victim inside of the house in the minutes after the bloody attack, she told him that "[his] father" was the assailant. J further testified that, on the night of the attack, he told the police that the victim had identified the defendant as the person who attacked her. He also testified that, on the night of the incident, he, too, had identified the defendant as the person who attacked the victim.[5] J told the jury that, on the night of the incident, he told a police officer that the assailant "looked like [his] father." This testimony was consistent with the statement he gave to the police approximately three weeks after the attack.

---

[5] The following colloquy occurred between defense counsel and J:

"Q. You, yourself, didn't identify your father that night. Correct?

"A. I don't remember.

"Q. Did you ever tell the police that—

"A. Yeah, I did tell the police. When it happened, ten years ago, I told them that was my father, yes.

"Q. And where—did you tell that [during] the 911 call?

"A. I don't know. You'd have to play it for me.

"Q. Okay. Did you tell any of the police that night?

"A. Yeah, I probably did, one of the officers, I probably did tell them it was my father.

"Q. Probably did or you did, or you don't remember?

"A. *I did. I did tell them it was my father.*

"Q. But you saw your father—I beg your pardon. You, yourself, saw an individual in black, right, attacking your mother?

"A. Yeah.

"Q. Okay. But you, yourself, never testified or identified him as being involved. Correct?

"A. *I did ten years ago*." (Emphasis added.)

This testimony reflects that, despite defense counsel's attempt to force J to admit that only the victim had identified the assailant as the defendant that night, J testified that he told the police that the attacker was the defendant on the night of the attack.

State *v.* Marcello E.

Second, Luis Poma, a former detective in the major crimes division of the Hartford Police Department who had investigated this case, testified that, on the night of the attack, J told him that the victim had identified the defendant as her assailant. Poma further testified that, on the night of the attack, he went to the defendant's home because the police had identified "a possible person of interest." The victim's testimony was also corroborated by Poma's testimony that the victim had identified the defendant as her assailant from a photographic array approximately five days after the attack.

Third, Valentine Olabisi, a supervisor in the patrol division of the Hartford Police Department, testified that he was a patrol officer on the night the victim was attacked. Olabisi explained that, on the basis of his preliminary investigation at the scene, he had identified the defendant as a "potential suspect" that night. Olabisi further testified that he also went to the defendant's home that night to speak with him, separately from Poma. All of these witnesses not only corroborated the victim's testimony identifying the defendant as the assailant, but also corroborated the fact that the defendant was a suspect in the attack from moments after it occurred.[6]

---

[6] The majority remarks that "[t]he earliest record demonstrating the victim's identification of the defendant as her assailant occurred five days following the attack, after the police showed her the photographic array, which included the defendant's photograph." Although I agree that the record indicates that the victim had first identified the defendant to the police about five days after the incident, this is not remarkable because the victim was in the hospital undergoing medical treatment for several days following the attack. Poma testified that the victim was still in the hospital five days after the attack, when he went to speak with her and to show her the photographic array, and that he had made three or four prior attempts to speak with her.

The majority remarks that "[t]he record does not explain what led the police to present the victim with a photographic array that included someone whom she obviously knew: her former boyfriend and the father of her two children." Footnote 9 of the majority opinion. I disagree. The record is replete with evidence that demonstrates that the defendant was a suspect from the night the crime happened—the victim told J that the defendant

State *v.* Marcello E.

On the basis of the foregoing, I would conclude that the state offered ample evidence that proved beyond a reasonable doubt that the defendant had committed the assault on the victim that night. Therefore, it is highly unlikely that the two prior incidents had any significant impact on the jury or the result of the trial. Indeed, the prior incidents played a minimal role in the state's case, in which the prosecutor presented the testimony of eight witnesses over the course of two days. The misconduct evidence came in very briefly at the beginning of the victim's testimony, encompassing approximately 2 pages of a trial transcript that is more than 350 pages in length. See, e.g., *State* v. *Thompson*, 266 Conn. 440, 456, 832 A.2d 626 (2003) (improperly admitted evidence was harmless when it was not repeated during trial and prosecutor did not emphasize or rely on it during closing argument); see also, e.g., *State* v. *James G.*, 268 Conn. 382, 401, 844 A.2d 810 (2004) (admission of prior misconduct evidence did not result in "a trial within a trial" when evidence consisted of only 25 pages of approximately 500 pages of trial transcript, and prosecutor "did not belabor his examination of [the witness]" (internal quotation marks omitted)). The prosecutor did not mention the incidents again until the cross-examination of the defendant, who chose to testify at trial. During direct examination, defense counsel brought it up again when he asked the defendant if he and the victim had "troubles," to which the defendant responded, "like any other couples, yes." After that, during cross-examination, the defendant confirmed that he had physical altercations with the victim and that, around 2008, they had stopped

had assaulted her, J told Poma that the defendant had assaulted her, and Hartford police officers went to speak with the defendant that night. Thus, because the defendant was clearly a suspect on the night of the crime, I see no reason why the defendant would not have been included in a photographic array that was presented to the victim. To be sure, the defendant did not raise at trial, and does not raise on appeal, any claim that the photographic array was improper or unnecessarily suggestive.

State *v.* Marcello E.

living together. The prosecutor mentioned this evidence only briefly during closing argument, and it was not a central piece of the closing, by any means.

Additionally, "[t]his court repeatedly has held that [t]he prejudicial impact of uncharged misconduct evidence is assessed in light of its relative viciousness in comparison with the charged conduct." (Internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 298, 278 A.3d 1044 (2022). Here, the two prior incidents were decidedly less vicious than the brutal stabbing at issue in this case. Because the prior incidents were far less severe than the conduct involved and injuries stemming from the charged offense, it was unlikely that the prior misconduct evidence had unduly aroused the emotions of the jurors. See, e.g., id., 298–99.

And, further mitigating any harm, is the fact that the trial court gave several limiting instructions. See, e.g., *State* v. *Paul B.*, 315 Conn. 19, 32, 105 A.3d 130 (2014) ("[a] trial court's limiting instructions about the restricted purpose for which the jury may consider [certain] evidence serve to minimize any prejudicial effect that such evidence otherwise may have had" (internal quotation marks omitted)). The trial court informed the jury, in its preliminary instructions, that certain evidence may be considered only for a limited purpose. Then, immediately after the victim testified about these two incidents, the court gave a specific limiting instruction. Subsequently, in the court's final charge, it again gave the jury a limiting instruction regarding this evidence.

The defense responded to the state's case and presented an alibi defense. In doing so, the defense called three witnesses—the defendant, D, and O. This evidence was unconvincing, at best.[7]

_____

[7] Although the defendant argues, and the majority accepts, that identity was the only real issue at trial, when the trial court decided the motion in limine, this was not clear. Defense counsel never raised that as a basis to exclude evidence regarding intent. Nevertheless, I take this opportunity to remind trial courts to exercise caution when considering the admissibility

State *v.* Marcello E.

The defendant's testimony was filled with inconsistencies. For instance, he testified that he had lived with O for approximately sixteen or seventeen years prior to the night in question but then later stated that he had lived with the victim until around 2008. He testified that he was at home all day on the day the victim was attacked, except for leaving for a short time to pick S up from school and to take her to a fast-food restaurant. But Olabisi testified that, when the defendant was questioned on the night of the attack, he said that he was home all day. The defendant never mentioned leaving to pick S up or to take her to the restaurant. In addition, the defendant testified that he had cooperated with Olabisi and had provided his driver's license when Olabisi asked him for it, but Olabisi testified that the defendant had failed to provide his driver's license or other identification card, and only confirmed "his name and date of birth."

Perhaps most significant, the defendant's alibi—that he was home all day—was contradicted by S's testimony. S testified that, although she had been with the defendant at his home earlier in the afternoon on the day the victim was attacked, before the victim came to pick her up, S saw the defendant leave the house with a backpack and get into a nearby car. S explained that she did not see the defendant come back home before she left with the victim around 5:30 p.m. It could not have been lost on the jury that S, who was eight years old at the time of the assault, had no reason to lie about the defendant's leaving the home, whereas the defendant did have a motive to lie about being home all day. Not only was S eight years old at the time of the assault, but the evidence introduced at trial showed that she had a good relationship with the defendant, O,

of misconduct evidence and to defer a ruling on such evidence until such point that there is a clear understanding of the evidence that will be introduced at trial.

State *v.* Marcello E.

and D. The defendant picked S up from school each day and brought her to the home he shared with O and D. From that information, the jury could have inferred that S had no motivation to lie in a way that would hurt the defendant. Given all of the evidence, it is likely that the jury placed significant weight on S's testimony that the defendant had left the home and concomitantly disbelieved the defendant's claim that he was home all day.

The defendant's other alibi witnesses, O and D, were no better. O and D testified that the defendant was home and asleep immediately prior to Olabisi's arrival to speak with the defendant on the night of the attack. This court has recognized that "[t]he credibility of . . . [the] witnesses is questionable because they are the parents of the defendant and, even subconsciously, their parental instincts may have led them to protect their son and [to] offer favorable testimony on his behalf." *State* v. *Greene*, 209 Conn. 458, 473, 551 A.2d 1231 (1988). Notwithstanding O's and D's attempts to corroborate the defendant's alibi for the time of the attack, neither of them was able to testify to being with him all day. Indeed, D testified that she arrived home *after* S left with the victim. Consequently, D was not home to know whether the defendant left the home as S had said he did.

For her part, O testified that she was home taking care of D's child. Although O testified that no one could have left the house through the kitchen door without her knowledge, the evidence established that there were two exterior doors in the home—the kitchen door and a front door. The front door was not visible from O's bedroom and was immediately adjacent to the stairs leading to the room where the defendant testified he was staying.

Therefore, even if the jury believed O and D, it could have also concluded that the defendant would have

State *v.* Marcello E.

been able to go down the stairs and to exit through the front door without O having seen him. The jury could also have concluded that the defendant could have committed the assault and still have made it home by the time O and D went looking for him. Indeed, O's and D's testimony established only that the defendant was home sleeping in the minutes prior to when Olabisi arrived. A reasonable jury could have concluded that neither O nor D was able to corroborate the defendant's alibi.

The majority concludes that the evidence in this case establishing the defendant as the perpetrator of the assault on the victim "was equivocal . . . ." First, the majority places great weight on whether the state established that the victim had identified the defendant as the assailant on the night of the incident and asserts that "the evidence adduced at trial was not entirely clear regarding whether the victim in fact identified the defendant as her attacker that night." Footnote 1 of the majority opinion. It is important to remember that identifying the defendant as the assailant *on the night in question* is not an element that the state was required to prove. The state needed to prove only that the defendant had perpetrated the crime.

Nevertheless, I disagree with the impact on the jury of the majority's perceived equivocation of the evidence on this point. First, the majority underappreciates the fact that Poma also testified that, on the night of the incident, J told him that the victim had identified the defendant as her assailant. In addition to Poma's testimony, the victim testified unequivocally at trial that the defendant had attacked her, and J also identified the defendant as the assailant. Despite this evidence, the majority is swayed by the fact that, on the night of the attack, after the victim was transported to the hospital and given an unspecified amount of pain medication, she also "told a police officer that she did not recognize

State *v.* Marcello E.

or see the person who had stabbed her.'' Id. Although I agree that Hunyadi testified that, when he spoke with the victim at the hospital on the night in question, she told him that she did not recognize her assailant, a reasonable jury likely placed this testimony in context, understanding that Hunyadi also testified that the victim had been given a substantial amount of pain medication shortly before he spoke with her.

In addition, a reasonable jury could infer that the victim had endured a traumatic event that night and was likely in a great deal of pain, so her ability to communicate and answer questions accurately would have been severely limited. I certainly do not conclude that the evidence is now equivocal because of that one statement the victim made while in the hospital and on pain medication. Instead, I look at the import of all of the evidence, namely, when her adrenaline was high, and she wasn't yet aware she was stabbed, the victim stated that the assailant was the defendant. J also said it was the defendant. Poma testified that J had told him it was the defendant. The police proceeded to question the defendant that night. The victim's one statement in the hospital, given while the victim was under the influence of medication and after she was stabbed across multiple parts of her body, including her head, does not make me, and likely did not make the jury, question all of the prior identifications.

Second, the majority concludes that it is not clear that J had identified the defendant as the attacker on the night in question. The majority asserts that ''J called 911 that night but did not identify the defendant as the assailant while on the phone with the police.'' Id. At trial, J testified that he did not remember whether he had identified the defendant as the assailant when he called 911. Poma testified that J did not identify the defendant by name in the 911 call, but the recording was not entered into evidence, and this court does not

State *v.* Marcello E.

know what J said during that call. In any event, given the highly charged nature of this moment, I would presume that J's more important task, while holding his badly bleeding mother, was getting her the help she needed rather than ensuring that he identified his father by name as the assailant during the 911 call.

Third, the majority relies on the fact that there was no "written record" or "recorded evidence" that the victim had identified the defendant as her assailant on the night of the attack as a reason for why the evidence "was not . . . clear . . . ." Id. This misses the point. There is no requirement that the state produce a written record or recorded evidence of the identification; the testimony of multiple witnesses is sufficient. The actions of the police on the night in question—namely, sending three officers, including Poma and Olabisi, to the defendant's home and attempting to speak with him on multiple occasions—demonstrate that the defendant was a suspect on the night of the attack.

Furthermore, the majority's focus on whether the victim had identified the defendant on the night of the attack seems to imply that, if he was not identified that night, the victim's subsequent identifications of him in the photographic array and in court are questionable. Meanwhile, the majority simply accepts the testimony of O and D, without subjecting it to the same level of scrutiny. The state established that O and D were present on the night of the attack when Olabisi was questioning the defendant about his whereabouts; however, they did not offer any alibi for the defendant at that time. After hearing the police explain that the victim was stabbed and question the defendant about his whereabouts, neither O nor D said that he was at home with either one or was willing to cooperate with the police.[8]

_____

[8] The majority indicates that Olabisi "also spoke with O and . . . D, both of whom were home at the time, but he did not ask for their statements or create notes summarizing their conversations." Olabisi testified that O and

State *v.* Marcello E.

The majority highlights the fact that J and S, who were thirteen and eight at the time of the assault, respectively, did not give their written statements to the police until several weeks after the incident, suggesting that those statements were questionable. But the majority does not mention that O and D never made any statement to the police. Indeed, the evidence in the record is that the first time that they offered information related to the defendant's whereabouts on the day of the attack was approximately eight years later, at the trial. J and S were minors at the time of the assault, and their mother, the victim, was in the hospital undergoing medical treatment and surgeries during the days and weeks following the incident. Any delay by the police in taking a formal statement could easily have been attributed to that. In contrast, O and D were adults who were present when Olabisi questioned the defendant on the night of the incident, and there is no evidence that they offered any alibi at that time or in the intervening eight year period; rather, the evidence is that they would not give Olabisi their names or cooperate on the night of the attack. Accordingly, I simply cannot agree with the majority's assessment of the relative strength of the state's case in this regard.

Finally, the majority concludes that, "*even if* the jury was more likely to credit the state's witnesses, [the majority] remain[s] unconvinced that the error was harmless because, without the prior misconduct evidence and considering the dangerous 'fine line' between the admitted evidence and propensity evidence, the remaining evidence was *sufficiently* equivocal as to the defendant's identity to warrant [the majority's] conclusion of harmful error." (Emphasis in original.) Not only is the majority adopting a new category of cases in which evidence is "sufficiently equivocal," but its con-

D were there but that he did not get their names, as "they were not cooperative, and they wouldn't provide any information."

State *v.* Marcello E.

clusion that the evidence in this case was equivocal is misplaced. (Emphasis omitted.) Unlike other cases in which this court has remarked that the evidence is equivocal, in the present case, the state did not rely solely on the victim's testimony to establish the defendant's identity. Instead, the state also introduced the testimony of J, who also identified the defendant as the perpetrator. The majority discounts J's testimony because he "was hesitant at trial to unequivocally testify that his father was the assailant, requiring the prosecutor to refresh [J's] memory with [his] written statement . . . ." Footnote 1 of the majority opinion. This position ignores the reality of this case. J was a thirteen year old boy when his mother, the victim, was attacked. Not only does he have the memory of the bloody incident and has had to watch his mother live with the injuries she sustained that night, but, approximately eight years later, he is being forced to testify at a criminal trial against his father, the defendant. Of course he is "hesitant . . . ." Id. A review of J's testimony, however, reveals that, although he was not happy about testifying at trial, he consistently testified that the victim had told him that it was the defendant who attacked her and that his memory of the day of the assault was clearer eight years ago than it was at trial. Contrary to the majority, I would conclude that the facts that J was the son of the victim and the defendant, and that he had identified the defendant as the assailant shortly after the incident, as well as eight years later, at trial, likely made his testimony more persuasive to the jury. Therefore, I disagree with the majority that the evidence in this case was "sufficiently equivocal . . . ." (Emphasis omitted.) Id.

Accordingly, after having reviewed the entire record, given the strength of the state's case and the lack of importance of the improperly admitted evidence to the state's case, I would conclude that the defendant did

not meet his burden of establishing that the jury's verdict was substantially swayed by the improperly admitted evidence.

For the foregoing reasons, I respectfully dissent.

———————————